call case number 19-20271, Total E&P v. Marubeni Oil & Gas. Mr. Weisburst for the appellant. May it please the court, Sanford Weisburst for the appellant, Total. I'd like to begin with our restatement section 293 argument because it applies to both of these two consolidated cases. And this argument is that Total and ATP sequentially owned the same interests and the assets and therefore owed the same obligations to provide for abandonment costs. And our argument under restatement section 293 is that where there is a full satisfaction of that common obligation, it discharges both obligors. And therefore, when ATP made a full satisfaction, it discharged Total. Now, I'd like to explain why is it that we say that ATP made a full satisfaction of those obligations. And our principal argument here is one as a matter of law, and it depends upon section 365 of the Bankruptcy Code, and specifically the fact that ATP assumed the operating agreements that contained the abandonment costs obligation. Assumption under this court's decision in national gypsum means a full commitment to perform the contract. And therefore, when ATP and Mogis jointly moved for approval of bankruptcy court for this assumption under section 365, that was a commitment to full performance. And it is inconsistent to find that ATP both assumed the contract, but then in the same breath, only partially performed or partially satisfied. We believe that that issue alone is dispositive, but we are not relying just on a technicality here. The reason why it would be unfair for Mogis to be allowed to escape the consequence of its assumption of those contracts is that it used the assumption at the time of the bankruptcy to satisfy the U.S. government. And the court can see this at page 6001 of the 20282 record. The government participated in the bankruptcy, and it said, we are very pleased to see that the parties ATP and Mogis have reached this deal. Had there not been an assumption, had there not been a commitment to full satisfaction, the government might have taken other actions. It might have taken, forced a more aggressive abandonment schedule to the detriment of Mogis and or ATP. The other consequence of the assumption and the commitment to full performance is that ATP and Mogis, it allowed them to unlock $12.5 million that was due and owing from Marathon, which was another predecessor interest holder. Marathon had contracted that it would pay $12.5 million upon proof of full performance of the abandonment. And so those two issues show that there was real meaning here to Mogis and ATP moving for an assumption as opposed to something else. Now, it goes beyond that, though. The contracts here that were proposed for bankruptcy court approval at the same time as the assumption also have language that shows that this was to be full satisfaction of ATP's obligation. And for example, I'd refer the court to page 5833 of the 20282 record. On 5833, this is one of the two main contracts, the abandonment fund agreement. And in paragraph five and nine, the court can see that this is described as ATP will satisfy the ATP obligations. And so again, like the assumption, this is a commitment to make full performance or other satisfaction under section 293 of the restatement. Now, the district judges, number one, didn't understand respectfully the full consequences of what an assumption means under national gypsum. But moreover, they focused unduly when they turned to the contracts here on these purported reservations of rights. So ATP, in the same we will reserve our rights to sue others in the future. And the district judges below said, look, that's evidence that this was not a full satisfaction. But again, we turn to restatement section 293, which provides that these sorts of purported reservations of rights are deemed ineffective as a matter of law where there is evidence of full satisfaction. And even if this judgment as a matter of law was appropriate on the full satisfaction issue, at a minimum, this was a jury triable issue. But on the full satisfaction issue, it's going to step me through and chronicle what evidence you have that ATP fully satisfied totals obligation in terms of money needed to pay the expenses of abandonment. Thank you, Judge Willett. So one thing to state at the threshold is our argument does not depend on an objective valuation of the consideration that was provided. There was consideration provided, including an overriding royalty interest, including physical assets comprising the pipeline system, and other considerations. All of that was handed over. But on this appeal and in the district court, in part, at least, we did not rely on an objective valuation of that. Rather, we relied, and with the court's permission, I'd refer back to the restatement section 293, illustration two, on how the parties subjectively viewed the parties being Mogis and ATP. How did they subjectively view that package of consideration? And in fact, it would be very hard to come up with an objective valuation, because at the time of the bankruptcy court approval, it was not known how much the abandonment was going to cost. It hadn't been performed yet. So to be clear, our argument depends on how Mogis and ATP viewed the consideration as opposed to some objective valuation. The evidence that we rely on there for how those parties viewed the package of consideration is that they assumed the contract, which again is a commitment to full performance, and they described the consideration in the very contracts that provided for that consideration as a satisfaction of ATP's obligations. They didn't say a partial satisfaction, they said a satisfaction. And that, Your Honor, is our main evidence. I think Mogis thinks that ATP has an obligation, and so does TOTAL. So ATP satisfies its obligation, but not TOTAL. How do you answer that? Judge Haines, it's our view that the, and I think it wasn't disputed really, below that it's the same obligation. So just to step back into the chronology for a second, the interest in these assets, that is the Canyon Pipeline System and the MC-305 well, were sequentially owned by first TOTAL and then ATP. No, I'm aware of that, but I think what they're saying is that the, so if I assign my house to someone else and they say we'll take on the mortgage, that doesn't take away my obligation to the bank to pay the mortgage. So even if the bank is happy with the person I That's what I'm asking about. I understand the sequential nature of this and all that, but I don't understand Mogis to be saying we think ATP doing something means TOTAL is off the hook. So it's our position that this is certainly, Your Honor's mortgage hypothetical is correct, but to take that hypothetical, our point is that if the assignee in that hypothetical provided consideration to the bank, that the bank viewed as a satisfaction, as a total satisfaction of the obligation, it's the same obligation that was jointly and severally owned by the sign or and the assignee. And it's not that there isn't two, it's not that both parties aren't potentially liable in the first instance, although I'll get to that argument because we have an argument on that as well. For purposes of this argument, I'm assuming that they both owe an obligation. And our point is that there is evidence here, at a minimum sufficient to go to a jury, that the obligation was satisfied by one of those parties. And when there is a satisfaction, it would be double recovery to allow more than that. And so really, this is again- But Mogis paid. I mean, they put on proof of what they did. So it's not like, I don't know, ATP went out there hammering in the park and that should be good enough. I mean, we have money involved, and that's what I'm trying to understand, how that all plays out. Yes, Your Honor. And again, back to Judge Willits, I think this overlaps with Judge Willits' question to some extent. Our argument here is one of how the parties, Mogis and ATP, subjectively treated this package of consideration. And in the restatement, Section 293, Illustration 2, this really proves the point, because what you have there is a $100 debt that was owed in that illustration. And it was deemed satisfied by the parties by handing over books that were worth $25. And so the issue isn't that $25 is less than $100. The issue is how the parties, how the debtor and the party owing the debt, viewed the $25 books. And if they view it as a total satisfaction, that is enough, even though in an objective sense, it's less. And that's our argument under Restatement 293. If I could turn briefly to our other argument, so the first argument, again, assumes arguendo that Total was liable even after making the assignment. But we also have an argument, our second argument, and this argument applies especially forcefully to the SEPS case. Isn't that really why it doesn't apply to MC-305? Because in SEPS, you have this real specific language that gives you a pretty good argument, but you don't have that same language in MC-305. So you want to say this language matters. Now you want to say, no, it doesn't. How can you do that? So, Your Honor, I grant you the language is definitely different. And moreover, there are some cases, including the Segal case from the We would admit our argument is stronger as to the SEPS agreement. And in fact, none of the cases that are cited by our adversary or the district court involved that sort of specific language that's in SEPS operating agreement 11.3. So I think we acknowledge this in the brief, but just to make it absolutely clear, we do believe our argument is stronger on that as to SEPS than it is at the MC-305. At the same time, we still attempted to make the argument under MC-305 relying mainly on the title, but we acknowledge that there is case law that's against us on that. The reason why the SEPS argument is stronger is because there's no case that has construed that sort of specific language, which could be found by this court on page 210 of the record in the 20282 case. Can I ask you a question about the hydrate remediation issue? Yes, Your Excellency. Would no operations that might normally occur in the production phase also count as an abandonment expense? I suppose it's possible. I don't know of an example off the top of my head. The example that I'm thinking of is in the Fifth Circuit's case. I think it's the platform, and you would only do that at the time of abandonment, not at the time of operation, but that doesn't answer Your Honor's question. Our hydrate situation, conceivably, let me just suppose that even if you were as prudent as possible in preventing hydrate from forming during operation, there still inevitably are going to be some at the time of abandonment. That's possible. Our argument here, and we think we had sufficient evidence to go to a jury on it, is that there was a delay in remediating hydrate blockage during operation, which exacerbated the cost at the time of the abandonment. It was a situation where there was a deferral of the same exact cost to the abandonment period, but it is possible that there could be some residual hydrate blockage in any event, even if there was prudence. What we're arguing is that we should be allowed to show to a jury, and this is all in the context of our expert was actually blocked from testifying at all, so we didn't get that chance, but we would like to argue that this cost should have been taken care of during the time of operation, and the key language in this operating agreement on hydrate blockages is at page 9606, which discusses hydrates as a matter of production or operation and not as a matter of abandonment. I want a question about that operating. I'm sorry, Judge Marks, go ahead. You go ahead, but I do want to get a question in before you finish. I just had a quick question. You mentioned the operating agreement, so in that MC 305 operating agreement, how does the contractual language there, how does it isolate liability to owners at the time of abandonment as it seems to in the CEPS operating agreement? So in the MC 305 agreement, we're talking about 18.4, and our argument here depends entirely, we acknowledge, on the title of that provision, which is why it's not as strong as the CEPS argument, but the language is abandonment operations required by governmental authority, and our point is that that is the prerequisite or the gateway to that provision and that the requirement by the government and governmental authority here did not occur until 2014. Total had transferred its interest in 2006, so it's dependent on the title of the provision. Judge Marks, go ahead. My question is about the overriding royalty interest and the dispute about whether or not the point raised on appeal, which was covered in Rule 50B, was not properly raised in the Rule 50A motion for judgment as a matter of law, and I want you to address that. In other words, the question of waiver. Yes, I believe Your Honor is referring to how the ORRI should be allocated among the various interest holders. Yes, so this is a question, first of all. The jury lacked any evidence that the 11.5 million was associated solely with MC 305, I think is where the Rule 50B differs from the Rule 50A. Yes, understood, Your Honor. I actually believe that the record is that that argument was only for the first time in a Rule 59 motion. It was not even made in a 50B motion as far as I know. Either way, it was a waiver in our argument, and the reason is because I'll address the waiver, but then let me address the merits as well. In terms of waiver, it was not raised in the 50A motion. It could have been raised at the time. It was clear from the record that Total was arguing that the entire $11.4 million should be credited, so that's a waiver under this court's case laws, but under the merits, our point is that because all the other parties had settled already and are out of the picture and are not subject to litigation, the only conceivable party who's left who could get credit for that $11.4 million is Total. That's our argument on that issue, Your Honor. All right. Okay, your time has expired. We've saved time for my name is Paul J. Goodwine. I represent Marabini in this consolidated appeal. On behalf of Marabini, thank you for granting oral argument for your time and attention this morning. We do appreciate it. I'd like to start with a quick discussion on just the totality of the jurisprudence that relates to predecessor liability. This court has ruled on that issue in the Chieftain case in 2008. Of course, we rely upon the Industrial Development Board case from the Supreme Court of Alabama from 2013 to adopt that same principle, although globally not oil and gas-centric, in Alabama. Of course, we have the Siegel case. I'll start with Siegel, Texas Supreme Court, 2008. I think that the issue is adequately briefed, but the language in the MC-305 case tracks very well and very closely to the Siegel case. I think that from an isolated issue relating to MC-305, Siegel is directly on point. Now, to address some of the question and answer relating to the SEPS agreement, there are two provisions naturally in play. 11.3, which caused a question by the panel earlier, but we can't forget about 14.1 also, which we think also has very clear language at the end of the day, which is directly on point. The few things I would like to say about 11.3 is that first, this language can also and should also mean that Marabini should pay no more than its proportionate share when it comes to abandonment. So you need to look at that language both ways. It's just not pinpointing that it's just the parties that happen to be the last party standing. At the end of the day, it also says that no one should pay more than what they owned at that time. So from our perspective, 11.3 tells you what the percentages are as if there is not an assign or assignee issue. If there is an assign or assignee issue, the very clear language in 14.1 comes into play, which indicates in a clear parenthetical that parties remain liable for their share of funding and abandonment liabilities even post-assignment. And what's of what accrued before or after the assignment. The parenthetical in 14.1 which says which obligations include liability for abandonment of the common system or that portion of the common system in existence as of the date of execution of the assignment clearly indicates that in a scenario in which abandonment is due and one of the parties owning at the time of abandonment is not performing, that the assignore remains liable, but only as to the extent of the system that was installed at the time of the assignment. Now, the record is clear. The entire system was installed by the time Total assigned to ATP in 2006. Therefore, it's a full scope abandonment retained by Total. So my encouragement to the panel is if you're looking at 11.3, you need to look at it in the context of setting kind of global percentages. And we had three parties at the time of abandonment, Black Elk, ATP, and Marabini. So once you set those, if one of those parties doesn't perform, you need to then look to 14.1 to see what you do. And that clearly indicates you go up the chain of time. A good line. It's kind of a rudimentary question, I guess. But in that set operating agreement, what meaning should we give to the phrase at the time of abandonment? I think at the time of abandonment indicates, like I said, that you have the concept of each party owning a separate percentage. And I don't think this is the driver, but the percentages within the Canyon Express operating agreement are a little bit more nuanced because there were three different properties feeding into the pipeline system, and there was a weighting average that allowed everyone to come up with the percentages. So in section 11.3, when it talks about the equity interest at the time of abandonment, that's talking about what each party would owe in order to divide up who pays what. It has nothing to do with a release, a waiver, or any type of ability for an asked ignorer to say, I fully relied upon 11.3 to the full exclusion, and I ignored 14.1 when I did my assignment, and without a release from the other parties, I'm scot-free. And so when you look at the language in 11.3, and I understand the question is what does it mean, from my perspective it means you look at what ATP's percentage is, what Marabini's percentage is, and what Black Elk's percentage is, what were those at the time was due. And then if there is a default by one of those entities, you then go to 14.1, and then go back up the chain of title as appropriate. So for example, the predecessor to Black Elk, who also didn't pay and was in bankruptcy, paid their full share. BP, Marathon, they were both predecessors also to ATP, they paid their full share. They didn't limit those payments just to MC305 or the other properties involved, it specifically included the Canyon Express pipeline system. So in our view, it's a two-step process. 11.3 gets you to what the percentage is for each party owning at that time, and if there's a default, 14.1 kicks in. From our perspective, to be kind of blunt, we always thought that the clarity of 14.1 within the created the really good argument for Marabini, and then the reliance upon the Seagull case within the MC305 case is what carried the day there. So with that, I'd like to address, unless the court has other questions on that topic, I'd like to move to some of the issues in the satisfaction argument that Mr. Weisburst articulated. What I think we need to understand first is who is bending, because the point I'm going to make in a second when we start talking about the restatement is that the whole restatement section 293 and other sections around that section deal with copromisors, because Bennu is clearly not liable, along with Total and Marabini and ATP and the other owners in both SEPs and Mississippi Canyon Block 305. So let's just take a step back for one second. In the ATP bankruptcy, it was filed in August of 2012. The transaction that led to the Marabini became the operator of Canyon Express occurred in January of 2014, so that was about a year and a half into the ATP bankruptcy. Bennu was created about six months prior to that, in the late summer, early fall of 2013. And Bennu was created by certain of the lenders of ATP to the Canyon Express. So let me be clear. ATP and Bennu are not the same entity. They're not joined at the hip. They don't have common officers or directors. They actually had an adversarial relationship during the bankruptcy and during the foreclosure process. And Bennu certainly was not a co-obligor for Canyon Express assets. The underlying agreements specifically include acknowledgments by, or I should say, not an acknowledgment, but a clear statement by Bennu that they're not inheriting any of ATP's abandonment liabilities, specifically including Canyon Express. You say they're not the same, and I understand that. And if this was the case about ATP versus Bennu, that would be one thing. But it reminds me a little bit of a country that's at war with another country. All of a sudden, the Civil War country comes together. And while they might have disagreements, they all agree, we don't want this other country coming in. And so why isn't that the case here, where ATP and Bennu may disagree on some stuff, they come together to take on any adversaries, such as Mogis? Well, you mean Total? No. Mogis is the one trying to get money from ATP. Total wasn't trying to get money from ATP. You all were, right? I hope I didn't miss that big a point. No, I missed your point. So, I mean, once y'all settled, maybe you're not enemies or whatever the right term is, but you started out that way. Y'all were trying to get money out of ATP, and everybody and their brothers or whatever the right analogy is. No, because the motivation for Bennu to contribute the override did not come due to any allegiance with ATP. It came from pressure from the federal government that was broader than just a Canyon Express issue, because as the foreclosure proceeding was unfolding with ATP, the government was concerned that all the good assets were going to leave the building to Bennu, and there'd be a pile of P&A left for everyone else to address. So it came directly from the United States government putting pressure on the lenders and Bennu to contribute what it could. And from our perspective, obviously the override having zero value at the time, and to this day is still zero value, was an easy thing to part with in that regard to contribute to the process. So I respectfully disagree that Bennu was joined at the hip or fully supporting ATP. They quite frankly were adversaries at that time, and it was through the federal government putting pressure on Bennu that resulted in the contribution being made at the end of the day. And what we can't lose sight of is regardless of whether we talk about the restatement or we talk about some of the other issues, the documentation that we have is replete with reservation of rights language. And also the bankruptcy judge saying, I'm staying out of what all this means. You know, is Total benefiting from this or not, or I'm out of there. So it kind of, yes, you can reserve rights, but if you've received full satisfaction, I mean, if you had a $100,000 car wreck and you got $100,000, reserving your right against Mr. X, who also caused the car wreck, doesn't really help you. You have complete satisfaction. The one satisfaction rule in Texas. I don't know as much about Alabama, but I do know a fair amount about Texas. So the one satisfaction rule would say you've been satisfied. Now I understand your argument here that you paid dollars that are more than you think you had to pay. I get that. But I'm just saying that the total satisfaction can depend on those circumstances. So I don't know that the fact that you reserve rights is enough to defeat the one satisfaction sort of argument or total satisfaction argument. Understood. We think that it's clear under Alabama law that settlement agreements under Alabama code 12-21-109, you have to give some deference to the parties. And we think there's a clear intent to reserve the rights against the other liable parties and that the case law that we cited both in the briefing and at the district court level and as relied upon by the district court judges, the release of one party does not extinguish liability of other parties where there's been a reservation of rights. And there is one place in the agreement that can be brought in is that there's only one place I think in the entire agreement where it talks about what actually happens to the override. And it's clear that the credit that's provided that can be taken by ATP or the other predecessors only comes into play if there is an actual payment made, which certainly hasn't happened yet. And at the end of the day, you know, most likely will not based upon the evidence presented at trial. So when we go through the process and you think about how things were divided up within the bankruptcy court, the whole point of the abandonment fund was to ensure that whatever value may derive itself would find its way to satisfy ATP's obligations that were to nurture the benefit of the predecessors of interest. But so far only about 238,000 has been derived and that's through the sale of scrap and various equipment. So without the override having any value or making any payments, we're at the point in time, as we sit here today and another year has passed since trial, and there's still no well-drilled in Mississippi Canyon WAC 348, which further indicates I think that down the road the value is going to be, you know, zero as was articulated in trial. But going back to the case law, and respectfully it's Alabama, not Texas, but I think when you have the reservation of rights and you look at what satisfaction in this case, and the only place... Does the Alabama one satisfaction rule differ from the Texas one? I mean, I said it was Alabama law. I was just analogizing, but am I wrong on that analogy? To be honest, I don't know. I'm not an expert on Texas law and we obviously studied Alabama law for the underlying... I cited a Texas case though, so I mean, you know, Texas does a lot of oil and gas, those people cite it even in other states. So anyway, I made clear that I know this is Alabama. I was simply saying one satisfaction rule kind of is what it is. If you're saying Alabama law is different on that, fine. I don't think you can show me that it is. Right. Okay. Well, from our perspective, nowhere in the documents does it say full satisfaction. And nowhere can it be read that satisfaction trumps the reservation of rights when you look at Alabama law. Nowhere is there, you know, any indication that Total contributed anything to take advantage of this release that you're talking about at the end of the day. And so when you look at the Alabama case law on point, we think it's pretty clear that when you have the reservation of rights included within the underlying documentation, the full satisfaction document or the full satisfaction argument, you know, no longer holds water at the end of the day. Now, under the restatement, I'd like to point out a couple of things. Number one is that Total did not cite any Alabama case law. This is basically their argument is under the restatement. And under restatement section 293, when you read through it, there are explanations of what happens when promisors contribute this or contribute that. Then when you walk through each of the examples, it still contemplates that each of the parties involved is a promisor. So if I adequately address Judge Haynes' concerns, which I may or may not have, and Bennu is not an actual call the court's attention to restatement section 295, which more precisely deals with the situation in which there is a reservation of rights at the end of the day. Now, just to talk about it, because it was raised... I'm sorry, I'm looking at their brief, Total's brief, and they have, I'm just looking at their table of authorities, and they have, I don't know, 1, 2, 3, 4, 5, 6, 7 Alabama cases on the first page. Do they cite any Alabama cases? On the satisfaction issue. Okay. All right. I was going to say, wow, I didn't remember that. Beyond the satisfaction issue. Okay. They go directly to restatement 293. Then they do cite to a Holland v. United States case, but that applies Illinois law, not Alabama law, and also very clearly doesn't deal with a scenario in which there's a settlement with the reservation of rights. So we think it is not applicable to... No, that's fine. That's a good clarification. I just was thinking, wow, I didn't recall that they didn't cite Alabama cases. No, it's literally just on the satisfaction issue. But when we go back to the basics, from our perspective, it is very, very clear that Bennu and ATP are two totally separate companies and there was no actual legal obligation for Bennu to contribute the override to the process because of a relationship with ATP, with Marabini, or with Total. It completely came from pressure from the government at the end of the day. And that's in the record, I think fairly clearly. And it is even something within the briefing at the district court level that Total has acknowledged at the end of the day. So with that, unless there are other questions, Your Honor, we do appreciate your time and we would like to plead for the relief as articulated within our briefing. So I can end this exactly at 20 minutes. Okay. Nicely done. All right. Mr. Weisswurst, you can go back. Yes, I'd like to start with Alabama law, a point that Mr. Goodwin talked about. If the court at its leisure could look at page 32, note nine of the opening brief, we cite several Alabama Supreme Court cases that have relied on restatement second of contracts. We acknowledge that the Alabama Supreme Court has not yet endorsed or rejected 293 specifically in any case, but in a longstanding case from 1852, and then in a more recent case from 2002, the Alabama Supreme Court has adopted the same total satisfaction principle that we rely on. And if I could just read from the Johnson v. Collins case cited in that footnote, if two or more be bound to the performance of one duty and the obligee accepts from one of the obligors something in lieu of a strict performance and in satisfaction of the debt or duty, this shall discharge all. For the obligation being satisfied in discharge as to one, it is necessarily satisfied in discharge as to all. That's Alabama law. We have little doubt that the Alabama Supreme Court would follow section 293 in light of that case. If this court has doubts about that, the court could consider certifying the question to the Alabama Supreme Court, but we don't think that's necessary. We think the law is clear. Now, I like to talk about Bennu because Mr. Goodwin focused a fair amount on Bennu. Yeah, that's an interesting question. I've never heard of us asking a state Supreme Court outside our circuit to receive a certified question. I'm not saying you couldn't do it, but I'm not aware of it. Your Honor, again, we don't think it's necessary, but the Alabama court does have a rule of appellate procedure 18 that allows for such certification from any court of appeals. On the Bennu issue, the key point here is not that Bennu ever owed any obligation. Bennu was a creditor of ATP. It had a vested, important interest in the success of ATP and its reorganization proceeds. Therefore, it had every interest in the world in making sure that happened. Therefore, in the context of that bankruptcy, as Judge Haynes pointed out, ATP and Bennu did become aligned, and they both wanted to satisfy and deal with this mogus issue. There's no purpose to Bennu except ATP and trying to resolve it in a way that benefits the creditors. Exactly. They wanted the debtor, ATP, to survive so that the creditor would do well in the long run. If I could refer the court on record 20282, page 5833, paragraph 5, we think this is the clearest language in the case on this Bennu issue. What it says is that ATP will satisfy the decommissioning activities solely in accordance with this agreement, including through Bennu's participation in this agreement with regard to the Camden Hills DOR-ORRI as provided herein. Mr. Goodwine, in terms of the ORI, just very briefly, this is a nuanced point, but there's two halves to the ORI. One half, and they both come from Bennu, but one half goes into the abandonment fund. The other half goes outright to ATP, sorry, to mogus. In the record, there is evidence that whether or not a well was ever to be built, that piece, that half that went directly to mogus had real value. The court could look at 20271 record, page 20346. That's the most important evidence that it was worth at least $11.4 million. The jury could have concluded that. We don't rely, again, on an objective valuation, but there was real money here. In the gray brief of mogus, the final brief in this appeal, note 31, they acknowledged that there had been an offer to purchase a package of ORIs, including this one, for much more than $11.4 million. So this is a marketable asset. It has real value. We're not trying to escape on a technicality here. Value in the oil and gas world is always somewhat up and down, right? Right now, it's kind of down, but there's been other days. I can still remember waiting in long lines to get gas, and then it's up. Absolutely. I think the relevant time here is the time of the bankruptcy court's approval. At that time, this had real value. Now, one point that I didn't hear Mr. Goodwine address at all, which, again, I want to go back to because it's really the linchpin, the most important piece of our full satisfaction argument, is the assumption, the Section 365 assumption. We heard Mr. Goodwine. I didn't hear him address that. I did hear him say, well, Bennu put in its money only because it wanted to satisfy the U.S. government. But that really proves our point on the assumption. An assumption under national gypsum, this court's case, means a commitment to full performance. And you had the U.S. government involved in the bankruptcy, wanted to see this abandonment take place, wanted some certainty. It was in Mogis and ATP's and Bennu's interest to give the U.S. government that certainty. They did it via an assumption. And to allow Mogis to take a different characterization now would be inequitable and contrary to Section 365. I see that my time is expiring. Unless the court has further questions, I will rest on my briefs. Okay. Thank you very much. We appreciate both of you all. We appreciate your participation in this video oral argument. I would now ask the courtroom deputy to please excuse the lawyers and the public from the courtroom.